**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KRISTIAN L. HODGE,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 08-455** |
| | ) | |
| **MICHAEL KLOPOTOSKI,[1]** | ) | **Magistrate Judge Lisa Pupo Lenihan** |
| **Superintendent, SCI-Dallas, the** | ) | |
| **DISTRICT ATTORNEY OF** | ) | |
| **ALLEGHENY COUNTY, and the** | ) | |
| **ATTORNEY GENERAL OF** | ) | |
| **PENNSYLVANIA,** | ) | |
| | ) | |
| **Respondents.** | ) | |

## MEMORANDUM OPINION

Petitioner Kristian L. Hodge ("Hodge"), a prisoner incarcerated at the State Correctional Institution in Dallas, Pennsylvania ("SCI-Dallas"), has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The Commonwealth of Pennsylvania contends that the petition should be denied, and that no certificate of appealability ("COA") should be issued. For the reasons that follow, the petition will be denied, and no COA will be issued.

**I.    Background**

During the period of time in question, Dr. Marion Skezas ("Skezas"), a practicing physician, resided at 1601 Coursin Street, in McKeesport, Pennsylvania. Trial Transcript ("TT") at 110. On Saturday, December 4, 1999, Skezas was operating a gray 1984 Mercedes-Benz

---

[1]James Wynder ("Wynder"), the former Superintendent at the State Correctional Institution in Dallas, Pennsylvania ("SCI-Dallas"), was originally named as a respondent in this action. Because Michael Klopotoski ("Klopotoski") has succeeded Wynder as the Superintendent at SCI-Dallas, he has been substituted as a respondent by operation of law. FED. R. CIV. P. 25(d); *Glaus v. Anderson*, 408 F.3d 382, 389 (7th Cir. 2005); *Rodwell v. Pepe*, 324 F.3d 66, 68, n. 1 (1st Cir. 2003).

("Mercedes") owned by her niece, Constance Michelle Skezas ("Constance").  TT at 110, 121.

Skezas parked the Mercedes inside of her garage at approximately 8:00 P.M.  TT at 111.  Inside

of the Mercedes was a bag containing Skezas' credit cards, a stethoscope, a sphygmometer, a

tuning fork, and some syringes.  TT at 113.

     Skezas awoke for work at approximately 6:00 A.M. on Sunday, December 5, 1999.  TT

at 112.  After entering her kitchen, she discovered that both the keys to the Mercedes and her

garage door opener were missing.  *Id.*  Her entry into the garage revealed that the Mercedes had

been stolen.  *Id.*  Skezas later observed that the windows of her first-floor bathroom had been

broken.  TT at 114.  She subsequently contacted the McKeesport Police Department to report the

theft of the Mercedes.  TT at 115.

     At approximately 10:30 P.M. on Tuesday, December 7, 1999, Officer Daniel Wensel

("Wensel"), a police officer employed by the City of McKeesport, saw the Mercedes travel in the

wrong direction on a one-way street.  TT at 123.  He followed the Mercedes, but the driver

attempted to evade his police vehicle.  TT at 126.  The Mercedes eventually came to a stop.

Wensel then observed two black males running away from the Mercedes.  TT at 126, 140.  He

did not actually witness their exit from the vehicle.  TT at 139.  Wensel later verified that the

Mercedes was owned by Constance.  TT at 141-142.

     William Semenko ("Semenko") lived within walking distance of where the Mercedes had

been abandoned by its occupants.  TT at 160-163.  He arrived home at approximately 10:40 P.M.

on December 7, 1999.  TT at 163.  Semenko, who had stopped at a Giant Eagle grocery store on

his way home from work, was carrying a bag of groceries when he exited his vehicle.  TT at 164.

After closing the door to his vehicle, Semenko observed that a black male with a small pistol had

started to approach him.  TT at 164-165.  The individual's face was not visible, since he was

"bundled up."  TT at 164.  The assailant demanded that Semenko turn over his wallet.  TT at

165.  Semenko replied, "You really don't want to do this."  *Id.*  As Semenko began to yell for

help, the assailant shot him in the left side of his lower abdomen and upper groin.  TT at 166.

Semenko fell to the ground, and the assailant proceeded to run away.  TT at 167.  Semenko was

airlifted to the University of Pittsburgh Medical Center ("UPMC") Presbyterian Hospital in the

Oakland area of Pittsburgh, Pennsylvania.  TT at 168.  He underwent surgery to repair a

damaged femoral artery.  *Id.*  Semenko was unable to identify his assailant.  TT at 170.  A police

officer recovered a shell casing from a .380 caliber semi-automatic Davis Industries pistol (".380

pistol") at the scene of the shooting.  TT at 632-634.

Michael Hajduk ("Hajduk"), a 74-year-old man, resided at 1250 Ravine Street, in

McKeesport.  TT at 271.  His brother, Andrew Hajduk ("Andrew"), lived in a nearby home.  *Id.*

The two residences were on opposite sides of an empty lot.  *Id.*  Hajduk owned a 1994 maroon

Ford Explorer ("Explorer").  TT at 272.  He checked his mail on a daily basis.  TT at 258.  Mail

very rarely remained in his mailbox from one day to the next.  *Id.*  Hajduk frequently kept large

amounts of cash in his pocket.  TT at 275.

Kimberly Manches ("Manches") was employed as a loss prevention detective for an

Ames Department Store located at the Laurel Mall, which was approximately eight miles outside

of Uniontown, Pennsylvania.  TT at 426.  She was on duty at approximately 7:40 A.M. on

Friday, December 10, 1999.  TT at 427.  At that time, Manches observed a maroon Ford

Explorer pull into Ames' parking lot.  *Id.*  It was operated by a black male.  *Id.*  Ames had not

yet opened, and the only other vehicles in the parking lot were those operated by other Ames

employees.  TT at 428.  The black male sat inside of the Explorer without making eye-contact with Manches.  *Id.*    Ames opened at 9:00 A.M.  TT at 427.  At around 10:30 A.M., Manches was paged by an assistant manager, who asked her to follow a black male who had entered the store.  TT at 428.  Manches followed the individual, who appeared to be "very nervous."  TT at 429.  She watched as he left Ames, went into the parking lot, and opened the rear door on the driver's side of the Explorer.  TT at 430.  Manches did not approach the Explorer because she did not want the individual to spot her.  *Id.*  She wrote down the number appearing on the license plate of the Explorer, which was "DBS7914."  *Id.*  The black male drove the Explorer out of the parking lot and started to head toward Uniontown.  TT at 431-432.

Charles Allen Jarrell ("Jarrell") was employed as a mail carrier for the United States Postal Service.  TT at 255-256.  His daily delivery route included Ravine Street.  TT at 256.  On Saturday, December 11, 1999, Jarrell arrived at Hajduk's residence to deliver mail.  TT at 262. He became troubled after noticing that the mail which he had delivered on the previous day was still inside of Hajduk's mailbox.  TT at 263.  Jarrell called the situation to Andrew's attention before leaving the area.  *Id.*  Andrew was decorating his residence for Christmas when Jarrell informed him that the previous day's mail had never been removed from Hajduk's mailbox.  TT at 276.

When Andrew approached Hajduk's residence, he noticed that a kitchen table had been moved out of place, and that a screen door had been removed.  TT at 278-279.  Police officers arrived at the scene shortly thereafter.  TT at 279.  A hole was discovered above a door leading to the basement of the residence.  *Id.*  Andrew noticed that a wire had been pulled out of a telephone box located outside of the residence.  TT at 280-281.  Troubled by what he saw,

4

Andrew gave the police officers on the scene permission to forcibly enter Hajduk's residence.
TT at 281.

At around 4:30 P.M., Officer Christopher Olinski ("Olinski"), a member of the
McKeesport police force, forcibly entered Hajduk's residence by kicking in a door.  TT at 287.
He observed that a table had been pushed against a sink in the kitchen of the residence, that
several drawers and cabinets had been left open, and that blood had been splattered on the
kitchen floor.  TT at 288.  Olinski's superior officer, Lieutenant Carlton J. Nagy ("Nagy"),
proceeded to enter the residence.  TT at 288-289.  Other police officers were at the scene as well.
TT at 299.  They proceeded to search the residence.  TT at 299-300.  Hajduk's Explorer was not
there.

After entering a bedroom, Nagy discovered Hajduk's body underneath a bed.  TT at 300.
There was a significant amount of dried blood in the room, leaving Nagy with the impression
that Hajduk's body had been lying under the bed for a considerable amount of time.  TT at 300-
301.  The Allegheny County Homicide Division was called to the scene.  TT at 302.  Allegheny
County Homicide Detective Kevin McCarthy ("McCarthy") arrived at Hajduk's residence at
5:47 P.M.  TT at 305.  The bed was removed so that Hajduk's body could be observed.  TT at
310.  Hajduk's feet were bound together by a belt.  TT at 310-311.  McCarthy's examination of
the body revealed that Hajduk had suffered multiple stab wounds in his chest.  TT at 312-313.  A
"slash wound" was found behind Hajduk's left ear.  TT at 313.

Hajduk's body was transported to the Allegheny County Coroner's Office for an
autopsy.  Dr. Leon Rozin ("Rozin") performed the autopsy at around 9:15 A.M. on Sunday,
December 12, 1999.  TT at 679.  The autopsy revealed that Hajduk had sustained blunt force

trauma to his head.  TT at 682.  A very deep stab wound was found on Hajduk's neck.  TT at 683.  Multiple stab wounds were discovered around Hajduk's neck, chest and face.  TT at 684. Additional stab wounds were found on Hajduk's arms.  TT at 689.  A total of fifteen stab wounds were discovered on Hajduk's body.  TT at 692.  Rozin determined that Hajduk's blood and stomach contents had become mixed, and that blood had seeped into his lungs.  TT at 684. He concluded that the fatal blow inflicted upon Hajduk had been a particular stab wound to the chest.  TT at 694.

Shortly after 12:00 A.M. on Sunday, December 12, 1999, Hodge arrived at the Blue Mountain Motel ("Blue Mountain") in a maroon Ford Explorer.  TT at 442.  He rented a room that was suitable for two people.  TT at 443.  Hodge completed a registration card, which was required by Blue Mountain's policy.  *Id.*  On the registration card was the number "26462776," which was Hodge's driver's license number.  TT at 444.  The registration process was handled by Elaine C. Ringer ("Ringer"), who was the owner of Blue Mountain.  TT at 441-442.

At approximately 5:00 P.M. on Sunday, December 12, 1999, a black male used Hajduk's credit card to purchase a pair of shoes at Kaufmann's Department Store ("Kaufmann's"), which was located in the South Hills Village portion of Allegheny County.  TT at 468-473.  The black male was accompanied by a black female.  TT at 470.  The transaction was processed by a Kaufmann's employee named Frank Williams ("Williams").  TT at 468-473.

At around 5:30 A.M. on Monday, December 13, 1999, a local news outlet reported that law enforcement authorities were looking for a vehicle bearing the license plate number of "DBS7914."  TT at 432.  Manches, who happened to be watching the news at that time, recognized the license plate number as the one that she had recorded on Friday, December 10,

1999.  *Id.*  She relayed this information to her boyfriend, who contacted the Pennsylvania State Police.  TT at 433.  Manches later gave this information to Allegheny County homicide detectives.  *Id.*

Officers David Basille ("Basille") and Charles David ("David"), both of whom were employed by the Uniontown City Police Department, were on a routine patrol in Uniontown on Thursday, December 16, 1999.  TT at 447-448.  Information concerning Hajduk's missing Explorer had already been relayed to them by members of the Allegheny County Homicide Division.  At approximately 10:20 P.M., Basille and David observed a maroon Ford Explorer driving through Uniontown.  TT at 448.  They began to follow it in order to determine whether it was the one which had been taken from Hajduk's residence.  TT at 449-451.  They got directly behind the Explorer, viewed the license plate, and concluded that it was Hajduk's vehicle.  TT at 452.  At that point, the Explorer started to travel at an accelerated speed.  *Id.*  Basille and David activated the lights and sirens on their police vehicle.  *Id.*  Hodge, who was driving the Explorer, attempted to evade the approaching police officers.  TT at 452-453.  The Explorer ultimately entered an alley, crashed into an adjacent building, and blew out a tire.  TT at 453.  When Basille and David exited their police vehicle and approached the Explorer, Hodge got out and started to run.  TT at 454.  After an exhaustive chase involving several police officers, Hodge was arrested and placed in handcuffs.  TT at 454-457.  He was twenty-five years old at the time of his arrest.

Hodge sustained some minor cuts and abrasions during his altercation with the arresting police officers.  TT at 459.  For this reason, he was transported to a hospital for medical treatment.  *Id.*  He refused to give his name to the arresting police officers and the attending medical personnel.  TT at 458-459.  Basille searched the pockets of Hodge's pants and found a

7

driver's license containing both Hodge's name and the number "26462776."  TT at 460-462.

During his search of Hodge's pockets, Basille also discovered Hodge's birth certificate, a credit

card bearing Hajduk's name, a credit card bearing Skezas' name, and a receipt for merchandise

which had been purchased at Kaufmann's on December 12, 1999.  TT at 460-467.  During a

subsequent search of the Explorer, police officers found a .380 pistol.  TT at 634-635.

Hodge resided at 1701 Bailey Avenue, in McKeesport.  TT at 660.  Officer Brian Joseph

Washowich ("Washowich"), a member of the McKeesport police force, executed a warrant to

search Hodge's residence on Friday, December 17, 1999.  *Id.*  The search turned up pay stubs

bearing Hodge's name and the medical equipment that had been stolen from Skezas' residence.

TT at 663-668.

Eighteen-year-old Katrina Hawkins ("Hawkins"), a black female residing in Dormont,

Pennsylvania, was Hodge's girlfriend.  TT at 587.  On Friday, December 17, 1999, Hawkins was

interviewed by Officers James Morton ("Morton") and Lee Yingling ("Yingling"), who worked

as homicide detectives in Allegheny County.  TT at 588.  Morton and Yingling traveled to

Hawkins' home in Dormont at approximately 12:30 P.M., and Hawkins agreed to accompany

them to a police station located in the Point Breeze area of Pittsburgh, Pennsylvania.  TT at 613-

614.  At around 2:35 P.M., Hawkins agreed to give a tape-recorded interview concerning what

Hodge had said to her about the Explorer.  TT at 614-616.  During that interview, Hawkins

stated that Hodge had driven the Explorer to her residence at approximately 2:45 A.M. on

December 10, 1999, and that he had told her that the Explorer had belonged to a guy that he had

killed.  TT at 591.

Hawkins owned a white 1992 Mazda Protege ("Mazda").  TT at 588.  She was eventually

driven home by Morton and Yingling.  TT at 617.  During the trip, Hawkins told Morton and Yingling that Hodge had claimed to have taken cash from the man whom he had killed.  TT at 606.  Hawkins also informed Morton and Yingling that Hodge had frequently left some of his belongings inside of her Mazda.  TT at 618.  She consented to a search of the Mazda.  *Id.*  The search uncovered a warranty book for the Explorer with Hajduk's name on it, as well as other papers bearing Hajduk's name.  TT at 619-620.  Hodge's fingerprints were ultimately found on both Constance's Mercedes and Hajduk's Explorer.  TT at 555-556, 568.

## II.   **Procedural History**

Hodge was tried for the week-long crime spree involving Skezas, Constance, Semenko and Hajduk in the Court of Common Pleas of Allegheny County, Pennsylvania ("trial court"), before Judge Jeffrey A. Manning ("trial judge").  The jury trial commenced on July 18, 2000, and concluded on July 26, 2000.  Hodge was tried for two counts of burglary,[2] two counts of robbery,[3] and one count each of first-degree murder,[4] attempted murder,[5] aggravated assault,[6] carrying a firearm without a license,[7] theft by unlawful taking,[8] receiving stolen property,[9] and

---

[2] 18 PA. CONS. STAT. § 3502(a).

[3] 18 PA. CONS. STAT. § 3701(a).

[4] 18 PA. CONS. STAT. § 2502(a).

[5] 18 PA. CONS. STAT. §§ 901(a), 2502(a)-(c).

[6] 18 PA. CONS. STAT. § 2702(a).

[7] 18 PA. CONS. STAT. § 6106(a).

[8] 18 PA. CONS. STAT. § 3921(a).

[9] 18 PA. CONS. STAT. § 3925(a).

the unauthorized use of an automobile.[10]  TT at 875.

At trial, Semenko testified that he could not identify the person who had shot him.  TT at 170.  Nevertheless, Anthony Christian Joel Johnson ("Johnson"), a teenage friend of Hodge, testified that Hodge had admitted to shooting a man in his "private part" on Tuesday night, December 7, 1999.  TT at 209.  Johnson further testified that he and Hodge had been the two individuals that Wensel had seen running from Constance's Mercedes prior to the shooting.  TT at 208.  Douglas Woolheater ("Woolheater"), another teenage friend of Hodge, testified that Hodge had claimed to have stolen a Mercedes.  TT at 238-241.  Manches identified Hodge as the person whom she had seen driving Hadjuk's Explorer in Ames' parking lot.  TT at 431.  Basille identified Hodge as the individual responsible for crashing the Explorer into a building.  TT at 454.

Testimony was also taken from Special Agent Jeffrey R. James ("James"), who was employed by the United States Secret Service.  TT at 475.  James testified that, in addition to protecting the President and Vice-President of the United States (and their families), the Secret Service was also responsible for securing federal treasury obligations and investigating the counterfeiting of United States currency.  TT at 476.  He explained that he had become involved in Hodge's case after learning from law enforcement authorities in Allegheny County that Hajduk's credit card had been used at Kaufmann's.  TT at 477.  He went on to state that surveillance cameras in Kaufmann's had captured an image of a black male using Hajduk's credit card to purchase merchandise on December 12, 1999.  TT at 477-478.  The videotape, which was played for the jury, depicted the use of a credit card by a black male wearing a black

---

[10]18 PA. CONS. STAT. § 3928(a).

jacket with blue and white stripes.  TT at 479.  After the tape was played, James physically displayed a black jacket with blue and white stripes.  TT at 481.  The jacket had apparently been seized from Hodge at the time of his arrest.  TT at 480.

Hawkins had previously given a tape-recorded statement indicating that Hodge had admitted to murdering the owner of the Explorer.  Because Hawkins was planning to testify differently at trial, the Commonwealth requested an immunity order from the trial judge pursuant to 42 PA. CONS. STAT. § 5947.  TT at 225-231.  The trial judge granted the request in order to secure Hawkins' testimony at trial, and to preclude her from invoking her rights under the Self-Incrimination Clause of the Fifth Amendment.  TT at 232-234.  Hawkins testified that Hodge had stated that he had received the Explorer from "some guy," but that he had not elaborated on the matter.  TT at 591.  She acknowledged that she had told Morton and Yingling something different during her tape-recorded interview.  *Id.*  Specifically, she admitted that her prior statement had referenced an admission by Hodge that he had killed the owner of the Explorer. *Id.*  At trial, however, Hawkins denied that Hodge had actually made such an admission.  TT at 597.  She claimed that she had directly implicated Hodge in Hajduk's murder only because she had "felt intimidated."  TT at 601.  Hawkins further testified that she had seen Hodge use Hajduk's credit card.  TT at 596-598.

Morton testified about his encounter with Hawkins.  TT at 616-627.  Hawkins' tape-recorded interview was played in the jury's presence.  TT at 617.  Consequently, the jury heard Hawkins describe Hodge's inculpatory statement concerning the murder of the Explorer's owner.

Hodge opted not to testify.  TT at 713-714.  Only two witnesses were called to testify in

11

his defense.  Lieutenant Eugene Riazzi ("Riazzi"), a McKeesport police officer, testified that Semenko had pointed to a photograph of an individual named Robert Price ("Price") when asked whether any of a number of photographed individuals bore any resemblance to his assailant.  TT at 715-717.  According to Riazzi, this exchange between him and Semenko had occurred in the early evening of Wednesday, December 8, 1999.  *Id.*  At that point, less than twenty-four hours had elapsed since the shooting, and Semenko was still in an intensive care unit.  TT at 717-718.  McCarthy testified that Woolheater had told him during an interview that Hodge had owned a ".45 pistol" rather than a .380 pistol akin to the one used to shoot Semenko.  TT at 719-723.

Based on the evidence presented at trial, the jury rendered "guilty" verdicts with respect to all charges other than attempted murder.  TT at 875.  Thus, Hodge was convicted of first-degree murder, aggravated assault, carrying a firearm without a license, theft by unlawful taking, receiving stolen property, the unauthorized use of an automobile, and two counts each of burglary and robbery.  *Id.*  A "not guilty" verdict was rendered with respect to the attempted murder charge.  *Id.*  The jury evidently believed that the Commonwealth had not proven beyond a reasonable doubt that Hodge had formed an intent to kill Semenko at the time of the shooting.  Nevertheless, the "guilty" verdicts on the remaining counts indicate that the jury was convinced beyond a reasonable doubt that Hodge had committed the charged offenses against Skezas, Constance, Semenko and Hajduk.

After the verdicts were announced, the trial judge sentenced Hodge to a term of life imprisonment for the crime of first-degree murder.  TT at 879.  Hodge's post-trial motions concerning that conviction were denied by the trial court on September 26, 2000.  Doc. No. 12, p. 2.  On October 17, 2000, Hodge was sentenced to consecutive terms of incarceration totaling

not less than thirty-two and a half nor more than sixty-five years for some of the other offenses.[11]
Doc. No. 13-2, p. 12.  That same day, Hodge appealed his first-degree murder conviction to the
Pennsylvania Superior Court.  After Hodge's post-trial motions concerning the remaining
convictions were denied by the trial court, a separate notice of appeal was filed.  Doc. No. 12, p.
3.  The Superior Court consolidated Hodge's appeals in a *sua sponte* order dated July 9, 2001.
Doc. No. 13-2, p. 5.

On appeal, Hodge argued that the evidence presented at trial had been insufficient to
warrant a conviction for first-degree murder, that the trial court had erred in failing to grant
defense counsel's motion to sever the different charges for trial, that the trial court had erred in
permitting the jury to view photographs of Hajduk's body, that the trial court had erred in
allowing the jury to hear Hawkins' tape-recorded interview, and that the trial court had erred in
denying a motion for a mistrial made by defense counsel in response to statements made by the
prosecutor during her closing argument to the jury.  Doc. No. 13-3, pp. 2, 36-55; Doc. No. 13-4,
pp. 1-13.  The Superior Court rejected Hodge's arguments, and affirmed his convictions, in an
opinion dated April 5, 2004.  Doc. No. 13-4, pp. 16-35.  On April 28, 2004, Hodge filed a
petition for allowance of appeal with the Pennsylvania Supreme Court.  Doc. No. 13-2, p. 7.  The
petition was denied on September 9, 2004.  Doc. No. 13-2, p. 8.

On August 23, 2005, Hodge filed a *pro se* petition for collateral relief pursuant to
Pennsylvania's Post Conviction Relief Act ("PCRA") [42 PA. CONS. STAT. § 9541 *et seq.*].  Doc.

---

[11]On March 22, 2001, the trial judge resentenced Hodge for the crime of aggravated assault because the
previous sentence for that offense had resulted from the presentation of an incorrect "offense gravity score."  Doc.
No. 13-2, p. 12.  Nevertheless, the initial error ultimately proved to be inconsequential.  The same sentence of not
more than ten nor less than twenty years of imprisonment that had previously been imposed for the crime of
aggravated assault was imposed for that offense when Hodge was resentenced.  *Id.*

No. 13-5, p. 4.  Counsel was appointed for Hodge, and an amended PCRA petition was filed on April 10, 2006.  Doc. No. 13-5, pp. 1-19.  In his amended PCRA petition, Hodge argued that his trial counsel had been ineffective for failing to object to allegedly inflammatory comments made by the prosecutor during her closing argument to the jury.  Doc. No. 13-5, pp. 10-14, 19.  The trial judge filed a notice of intention to dismiss the PCRA petition on June 27, 2006.  Doc. No. 13-6, pp. 64-65.  The petition was ultimately dismissed by the trial court in an order dated August 15, 2006.  Doc. No. 13-6, p. 62.  Hodge appealed the denial of his PCRA petition to the Superior Court.  Doc. No. 13-6, p. 63.

Hodge argued on appeal that his trial counsel had been ineffective for failing to object to the prosecutor's allegedly inflammatory statements to the jury during her closing argument.  Doc. No. 13-6, pp. 6, 15-21.  In an opinion dated August 9, 2007, the Superior Court rejected Hodge's argument and affirmed the denial of his PCRA petition.  Doc. No. 13-6, pp. 24-31.  Hodge filed a petition for allowance of appeal on August 30, 2007.  Doc. No. 30-5, p. 24.  The Pennsylvania Supreme Court denied the petition on December 4, 2007.  *Id.*

On April 4, 2008, Hodge filed the instant petition for a writ of habeas corpus.  Doc. No. 1.  The Court permitted Hodge to amend the petition on June 17, 2008.  Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have consented to have this matter resolved by a United States Magistrate Judge.  Doc. Nos. 17 & 18.

III.    **Standards of Review**

A.      **Exhaustion and Procedural Default**

The exhaustion requirements applicable to claims asserted in a federal habeas corpus petition are rooted in subsections (b) and (c) of 28 U.S.C. § 2254, which provide:

### § 2254.  State custody; remedies in Federal courts

\*\*\*

(b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that--

(A) the applicant has exhausted the remedies available in the courts of the State; or

(B)(i) there is an absence of available State corrective process; or

(ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

(2) An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

(3) A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement.

(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

28 U.S.C. § 2254(b)-(c).  Consistent with this statutory mandate, each claim that a petitioner in state custody attempts to present to a federal court in a habeas corpus proceeding must have been "fairly presented" to each level of the applicable State's judiciary.  *Lines v. Larkins*, 208 F.3d 153, 159 (3d Cir. 2000).  "To 'fairly present' a claim, a petitioner must present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted."  *McCandless v. Vaughn*, 172 F.3d 255, 261 (3d Cir. 1999).  Federal courts typically dismiss without prejudice claims that have not been properly presented to the state courts, thereby providing petitioners with an opportunity to exhaust such claims.  *Lines*, 208 F.3d at 159-160.

Where a claim asserted in a habeas corpus proceeding has not been presented to the state courts, the statutory exhaustion requirement can be satisfied on the alternative ground that there

is "an absence of *available* State corrective process."  28 U.S.C. § 2254(b)(1)(B)(i)(emphasis

added).  This alternative ground requires a showing that state procedural rules preclude the

petitioner from exhausting his or her claims in the state courts.  *Lines*, 208 F.3d at 160.  In order

for the exhaustion requirement to be satisfied on this ground, however, the applicable procedural

rules must "clearly foreclose" review of the petitioner's unexhausted claims by the state courts.

*Whitney v. Horn*, 280 F.3d 240, 250 (3d Cir. 2002).  It is not sufficient for the petitioner to show

that it is "unlikely" that further state remedies are available.  *Id.*

      The mere fact that a petitioner can satisfy the statutory exhaustion requirement on the

ground that further state procedures are unavailable does not necessarily mean that a federal

court can reach the merits of his or her claims.  *Lines*, 208 F.3d at 160.  Claims deemed to have

been exhausted because of a state procedural bar are procedurally defaulted, precluding a federal

court from proceeding to address them further.  *Id.*  In *Cone v. Bell*, 129 S.Ct. 1769 (2009), the

United States Supreme Court explained:

> It is well established that federal courts will not review questions of federal law
> presented in a habeas petition when the state court's decision rests upon a state-
> law ground that "is independent of the federal question and adequate to support
> the judgment."  *Coleman v. Thompson*, 501 U.S. 722, 729, 111 S.Ct. 2546, 115
> L.Ed.2d 640 (1991); *Lee v. Kemna*, 534 U.S. 362, 375, 122 S.Ct. 877, 151
> L.Ed.2d 820 (2002).  In the context of federal habeas proceedings, the
> independent and adequate state ground doctrine is designed to "ensur[e] that the
> States' interest in correcting their own mistakes is respected in all federal habeas
> cases."  *Coleman*, 501 U.S. at 732, 111 S.Ct. 2546, 115 L.Ed.2d 640.  When a
> petitioner fails to properly raise his federal claims in state court, he deprives the
> State of "an opportunity to address those claims in the first instance" and
> frustrates the State's ability to honor his constitutional rights.  *Id.*, at 732, 748,
> 111 S.Ct. 2546, 115 L.Ed.2d 640.  Therefore, consistent with the longstanding
> requirement that habeas petitioners must exhaust available state remedies before
> seeking relief in federal court, we have held that when a petitioner fails to raise
> his federal claims in compliance with relevant state procedural rules, the state
> court's refusal to adjudicate the claim ordinarily qualifies as an independent and
> adequate state ground for denying federal review.  See *id.*, at 731, 111 S.Ct. 2546,

115 L.Ed.2d 640.

*Cone*, 129 S.Ct. at 1780 (brackets in original).  This does not mean, however, that federal habeas corpus review is barred every time that a state court invokes a procedural rule to preclude its review of the federal claims asserted by a state prisoner.  *Id.*  The adequacy of a given state procedural rule to bar a federal court from reaching the merits of a petitioner's claim is a federal question.  *Id.*; *Wright v. Georgia*, 373 U.S. 284, 288-293 (1963).  A state procedural rule can preclude federal habeas corpus review only if it is "firmly established" and "consistently and regularly applied" by the State's courts.  *Kindler v. Horn*, 542 F.3d 70, 78 (3d Cir. 2009).  "In addition, the state rule must speak in unmistakable terms, and the state courts' refusal to review a petitioner's claim must be consistent with decisions in similar cases."  *Id.* at 79.  "[A]n occasional act of grace by a state court in excusing or disregarding a state procedural rule does not render the rule inadequate."  *Amos v. Scott*, 61 F.3d 333, 342 (5th Cir. 1995).  A state rule is adequate to preclude federal habeas corpus review if it is applied by the state courts in "the vast majority of cases."  *Dugger v. Adams*, 489 U.S. 401, 410, n. 6 (1989).

In certain instances, a federal court may entertain claims that would ordinarily be subject to procedural default.  Because a writ of habeas corpus is an equitable remedy, the Supreme Court has found it inappropriate to rigidly apply the doctrine of *res judicata* in this context. *Schlup v. Delo*, 513 U.S. 298, 319 (1995).  A procedural default can be excused upon a showing of "cause" for the default and resulting "prejudice" to the petitioner.  *Johnson v. Pinchak*, 392 F.3d 551, 563 (3d Cir. 2004)("A procedural default generally bars review of a federal habeas corpus petition *absent a showing of cause and prejudice*.")(emphasis added).  Cause for not exhausting a claim exists where an external impediment, "whether it be government interference

17

or the reasonable unavailability of the factual basis for the claim," prevents the petitioner from exhausting the claim during the pendency of state judicial proceedings. *McCleskey v. Zant*, 499 U.S. 467, 497 (1991). If a petitioner can establish "cause" for procedurally defaulting a claim, he or she must shoulder the additional burden of showing "not merely that the errors at his [or her] trial created a *possibility* of prejudice, but that they worked to his [or her] *actual* and substantial disadvantage, infecting his [or her] trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982)(emphasis in original). If a procedural default results from the ineffective assistance of counsel, the Sixth and Fourteenth Amendments require that the responsibility for the default be imputed to the State, which may not "[conduct] trials at which persons who face incarceration must defend themselves without adequate legal assistance." *Murray v. Carrier*, 477 U.S. 478, 488 (1986)(brackets in original), quoting *Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980). Nonetheless, an error by the petitioner's attorney can be fairly characterized as the "cause" of a procedural default only where it is sufficiently egregious to constitute a constitutional violation under the standard enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984). *Hull v. Freeman*, 991 F.2d 86, 91 (3d Cir. 1993).

Where a petitioner cannot make a showing of "cause and prejudice," a federal court may nevertheless consider the merits of his or her unexhausted claims under circumstances in which the failure to adjudicate such claims would result in a fundamental miscarriage of justice. *Johnson*, 392 F.3d at 564. This exception to the procedural default doctrine is based on the principle that, in certain instances, "the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration.'" *Murray*, 477 U.S. at 495, quoting *Engle v. Isaac*, 456 U.S. 107, 135 (1982). The

"prototypical example" of a miscarriage of justice is a situation in which an underlying constitutional violation has resulted in the conviction of an innocent defendant. *Sawyer v. Whitley*, 505 U.S. 333, 340 (1992).  In that instance, the merits of a petitioner's claims can be considered notwithstanding his or her failure to raise them before the state courts. *Johnson*, 392 F.3d at 564.

In order to avail himself or herself of this exception to the procedural default rule, a petitioner must make a substantial showing that he or she is actually innocent of the crime for which he or she is incarcerated. *Schlup*, 513 U.S. at 324.  "To be credible, such a claim requires [the] petitioner to support his [or her] allegations of constitutional error with new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence–that was not presented at trial." *Id.*  If this requirement is satisfied, the federal court must consider "whether it is more likely than not that no reasonable juror would have convicted [the petitioner] in light of the new evidence." *Hubbard v. Pinchak*, 378 F.3d 333, 340 (3d Cir. 2004).  This standard "does not merely require a showing that a reasonable doubt [as to the petitioner's guilt] exists in the light of the new evidence, but rather that no reasonable juror would have found the [petitioner] guilty." *Schlup*, 513 U.S. at 329.  "The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *House v. Bell*, 547 U.S. 518, 538 (2006).  While the petitioner's innocence need not be determined with "absolute certainty" at this "gateway stage," his or her burden is to demonstrate that, in light of the new evidence, it is more likely than not that *any* reasonable juror would have reasonable doubt as to the petitioner's guilt. *Id.*

In the habeas corpus context, a federal court sits to ensure that an individual is not imprisoned in violation of the Constitution and laws of the United States, "not to correct errors of fact." *Herrera v. Collins*, 506 U.S. 390, 400 (1993). Consequently, a finding of "actual innocence" is not an independent ground for habeas corpus relief, but rather a "gateway" through which a petitioner can pass to have a federal court consider underlying claims that would otherwise be subject to procedural default. *Id.* at 404. In the absence of new evidence of the petitioner's innocence, the existence of an underlying constitutional violation provides a federal court with no basis for adjudicating a procedurally defaulted claim. *Goldblum v. Klem*, 510 F.3d 204, 225-226 (3d Cir. 2007). Only after the presentation of *new* evidence may a federal court proceed to consider whether, in light of *all* relevant evidence, it is more likely than not that no reasonable juror would vote to convict the petitioner of the crime for which he or she is incarcerated. *House*, 547 U.S. at 537-539; *Goldblum*, 510 F.3d at 225-226.

### B.       Habeas Corpus Relief

The Antiterrorism and Effective Death Penalty Act ("AEDPA") was signed into law on April 24, 1996. Pub. L. No. 104-132; 110 Stat. 1214 (1996). Title I of the AEDPA revised the statutory provisions governing a federal court's authority to issue writs of habeas corpus. Pub. L. No. 104-132, §§ 101-108; 110 Stat. at 1217-1226. Because Hodge's petition was filed after the effective date of the AEDPA, the Court must apply the standards applicable under that statute. *Werts v. Vaughn*, 228 F.3d 178, 195 (3d Cir. 2000).

The relevant statutory language, which was enacted as a part of § 104 of the AEDPA and is currently codified at 28 U.S.C. § 2254(d), provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to any

claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). As the statutory language makes clear, only the United States Supreme Court can "clearly establish" federal law for purposes of the AEDPA. *Mendez v. Knowles*, 556 F.3d 757, 767 (9th Cir. 2009); *Jennings v. Crosby*, 392 F.Supp.2d 1312, 1317, n. 4 (N.D.Fla. 2005); *Williams v. Spitzer*, 246 F.Supp.2d 368, 382 (S.D.N.Y. 2003). A state court renders a decision that is "contrary to" clearly established federal law where it applies a rule that contradicts the governing law as articulated in a Supreme Court decision, or where it confronts a set of facts that is "materially indistinguishable" from that confronted by the Supreme Court but nevertheless reaches a result different than that reached by the Supreme Court in the applicable precedent. *Williams v. Taylor*, 529 U.S. 362, 405-406 (2000). A state-court decision constitutes an "unreasonable application" of clearly established federal law where it "unreasonably applies the correct Supreme Court precedent to the facts of a case," or where it "unreasonably extends or refuses to extend that precedent to a new context where it should (or should not) apply." *Shelton v. Carroll*, 464 F.3d 423, 436 (3d Cir. 2006).

A federal court may not issue a writ of habeas corpus simply because it concludes in its independent judgment that a state court has *incorrectly* applied clearly established federal law. *Albrecht v. Horn*, 485 F.3d 103, 116 (3d Cir. 2007). Instead, the relevant question is whether the state court has applied a Supreme Court precedent to the facts of the petitioner's case in an

"objectively unreasonable manner."  *Price v. Vincent*, 538 U.S. 634, 641 (2003).  A factual determination made by a state court is presumed to be correct in a subsequent habeas corpus proceeding, and the petitioner bears the burden of rebutting this presumption of correctness by producing "clear and convincing evidence" that a contrary determination is warranted.  28 U.S.C. § 2254(e)(1).

### C.      Ineffectiveness of Counsel

The Sixth Amendment to the United States Constitution provides that, "In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defence."  U.S. CONST., AMEND. VI.  The Counsel Clause of the Sixth Amendment is applicable to the States by virtue of the Due Process Clause of the Fourteenth Amendment.  *Gideon v. Wainwright*, 372 U.S. 335, 342-345 (1963).  "It has long been recognized that the right to counsel is the right to the *effective* assistance of counsel."  *McMann v. Richardson*, 397 U.S. 759, 771, n. 14 (1970)(emphasis added).

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established the proper standard for determining whether the representation provided by a defendant's trial counsel has been ineffective.  Speaking through Justice O'Connor, the Supreme Court explained:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.  First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687.  The first component of an ineffectiveness claim requires an inquiry into whether the performance of the defendant's counsel has fallen "below an objective standard of reasonableness." *Id.* at 688.  "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.*  The second component requires an inquiry into the impact that an identified deficiency has had on the defendant's trial.  In order to set aside a conviction, a defendant must show that "there is a *reasonable probability* that, but for [his or her] counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694 (emphasis added).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*  In determining whether a defendant has been prejudiced by constitutionally deficient representation, a court must consider "the totality of the evidence" heard by the trier of fact. *Id.* at 695.  In situations where it is clear that a defendant cannot show that he or she has been prejudiced, a court is free to dispose of the case on that ground without deciding whether the representation provided to the defendant was deficient. *Id.* at 697.

The Supreme Court has construed the Due Process and Equal Protection Clauses of the Fourteenth Amendment to include the right of a convicted individual to have the assistance of counsel for a first-level appeal provided by the State as a matter of right. *Halbert v. Michigan*, 545 U.S. 605, 609-610 (2005).  Because this right to appellate counsel is grounded in the Fourteenth Amendment rather than in the Sixth Amendment, its dimensions are somewhat different than those of the right to trial counsel guaranteed under the Counsel Clause. *Martinez v. Court of Appeal of California*, 528 U.S. 152, 154-164 (2000).  Nevertheless, in *Evitts v. Lucey*, 469 U.S. 387 (1985), the Supreme Court held that a first-level appeal provided as a matter of

right is not adjudicated in accordance with the Constitution "if the appellant does not have the *effective* assistance of an attorney." *Evitts*, 469 U.S. at 396 (emphasis added).  Therefore, an appellant has a constitutional right to the effective assistance of counsel when pursuing a non-discretionary appeal that is similar to the right to the effective assistance of counsel afforded by the Counsel Clause to a defendant subjected to a criminal trial.  An individual alleging that the representation provided by his or her appellate counsel has been ineffective must satisfy the *Strickland* standard in order to obtain relief.  *United States v. Mannino*, 212 F.3d 835, 840, n. 4 (3d Cir. 2000).

## IV.  <u>Discussion</u>

In his original habeas corpus petition, Hodge raised nine separate claims.  Doc. No. 3, pp. 10-13.  Two additional claims were added on June 17, 2008, when Hodge's petition was amended.  Doc. No. 6, p. 1.  Thus, Hodge asserts eleven different claims in support of his request for habeas corpus relief.  Before addressing the particular issues presented in this case, however, the Court must address the Commonwealth's argument that Hodge's petition is barred by the AEDPA's one-year statute of limitations.  Doc. No. 12, pp. 10-11.

### A.  **The Application of the Statute of Limitations**

Section 101 of the AEDPA established a one-year statute of limitations for habeas corpus petitions.  Pub. L. No. 104-132, § 101; 110 Stat. at 1217.  That statute of limitations is codified at 28 U.S.C. § 2244(d), which provides:

**§ 2244.  Finality of determination**

\*\*\*
(d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of--

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).  Subsections (d)(1)(B), (d)(1)(C) and (d)(1)(D) are not implicated in this case.  Hence, the Court's inquiry concerns only the application of subsections (d)(1)(A) and (d)(2).

The Pennsylvania Supreme Court denied Hodge's first petition for allowance of appeal on September 9, 2004.  Doc. No. 13-2, p. 8.  Hodge had ninety days to petition the United States Supreme Court for a writ of certiorari.  *Bowles v. Russell*, 551 U.S. 205, 211-212 (2007).  Because Hodge did not file such a petition, his conviction was "final" within the meaning of § 2244(d)(1)(A) as of December 9, 2004.  *Kirk v. Phelps*, 596 F.Supp.2d 835, 840 (D.Del. 2009).  His *pro se* PCRA petition was filed on August 23, 2005.  Doc. No. 13-5, p. 4.  This filing tolled the running of the AEDPA's statute of limitations pursuant to § 2244(d)(2).  Nevertheless, the intervening 256-day period between the conclusion of direct review and the filing of the PCRA petition counts against the AEDPA's one-year statute of limitations.  *De Jesus v. Acevedo*, 567 F.3d 941, 943-944 (7th Cir. 2009); *Streu v. Dormire*, 557 F.3d 960, 962 (8th Cir. 2009).  Hodge's PCRA petition was "pending" within the meaning of § 2244(d)(2) until December 4, 2007, when

25

the Pennsylvania Supreme Court denied his second petition for allowance of appeal.  *Kindler v. Horn*, 542 F.3d 70, 76-78 (3d Cir. 2008), cert. granted, 129 S.Ct. 2381 (2009).  At the collateral-review stage, the statute of limitations was not tolled during the 90-day period available to Hodge for filing a writ of certiorari.  *Lawrence v. Florida*, 549 U.S. 327, 329-337 (2007); *Stokes v. District Attorney of the City of Philadelphia*, 247 F.3d 539, 540-543 (3d Cir. 2001).  Consequently, Hodge's habeas corpus petition needed to be filed on or before March 22, 2008, in order to be timely.

On April 4, 2008, Hodge filed his habeas corpus petition along with a request for permission to proceed *in forma pauperis*.  Doc. No. 1.  For statute-of-limitations purposes, this was the functional equivalent of filing the petition and paying the required filing fee.  *Jones v. Bertrand*, 171 F.3d 499, 501-504 (7th Cir. 1999).  Nonetheless, this filing occurred thirteen days after the passage of the applicable limitations period.  For this reason, the Commonwealth contends that the petition should be dismissed as untimely.  Doc. No. 12, p. 11.

In a case such as this, however, the actual filing date of the petition is not dispositive.  A *pro se* prisoner's habeas corpus petition is deemed to have been filed at the moment that it was delivered to prison officials for mailing to a federal district court.  *Burns v. Morton*, 134 F.3d 109, 113 (3d Cir. 1998).  In the absence of contrary evidence, a court will typically assume that a prisoner presented his or her petition to prison authorities for filing on the same date that he or she signed it.  *West v. Lockett*, Civil Action No. 08-482, 2009 WL 1270225, at *4, n. 2, 2009 U.S. Dist. LEXIS 38382, at *15-16, n. 2 (W.D.Pa. May 6, 2009); *Rhodes v. Senkowski*, 82 F.Supp.2d 160, 165 (S.D.N.Y. 1999); *Hudson v. Martin*, 68 F.Supp.2d 798, 799, n. 2 (E.D.Mich. 1999); *Colarte v. LeBlanc*, 40 F.Supp.2d 816, 817 (E.D.La. 1999); *Torres v. Irvin*, 33 F.Supp.2d

257, 270 (S.D.N.Y. 1998). Hodge signed his habeas corpus petition on March 3, 2008. Doc. No. 1-2, p. 14. The certificate showing the amount of money that he had in his account at SCI-Dallas was signed by Marilee Rodney ("Rodney"), an accounting assistant, on March 19, 2008. Doc. No. 1, p. 12. The documentary evidence suggests that Hodge's habeas corpus petition was delivered to prison officials before the expiration of the AEDPA's statute of limitations, and the Commonwealth has presented no evidence to support a contrary determination. Accordingly, the petition is deemed to have been filed in a timely manner.

### B.    The Procedural Default of the Wholly Unexhausted Claims

In *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999), the United States Supreme Court declared that, in order to properly exhaust his or her claims for habeas corpus purposes, a state prisoner "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's appellate review process." Thus, in order to exhaust his federal claims pursuant to § 2254(b)(1)(A), Hodge had to present them to the Superior Court on either direct appeal or collateral review. Hodge argues that the evidence presented at trial was insufficient to warrant convictions for burglary and robbery, that the "guilty" verdicts rendered by the jury were against the weight of the evidence, that illegally obtained evidence was used to convict him, that the trial court erred in failing to give jury instructions concerning voluntary and involuntary manslaughter, that his trial counsel was ineffective for failing to investigate evidence that Semenko had identified Price as the perpetrator of the shooting, and that his appellate counsel was ineffective for failing to raise his trial counsel's ineffectiveness on direct appeal. Doc. No. 3, pp. 11, 13; Doc. No. 6, p. 1. None of these claims were presented to the Superior Court. Doc. No. 13-3, pp. 1-55; Doc. No. 13-4, pp. 1-15; Doc. No. 13-6, pp. 1-23.

Therefore, with respect to these six claims, Hodge has not "exhausted the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1)(A).

Since Hodge did not present these claims to the Pennsylvania courts, he must satisfy the statutory exhaustion requirement on the alternative ground that "there is an absence of available State corrective process."  28 U.S.C. § 2254(b)(1)(B)(i).  This alternative prerequisite to the litigation of Hodge's claims can be satisfied only if Pennsylvania law "clearly forecloses" review of such claims by the Pennsylvania courts.  *Lines*, 208 F.3d at 162-165.  An examination of the applicable principles of Pennsylvania law reveals that such review is clearly foreclosed under the provisions of the PCRA.

The relevant statutory language provides:

**§ 9545.  Jurisdiction and proceedings**

\*\*\*

**(b) Time for filing petition.--**
(1) Any petition under this subchapter, including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final, unless the petition alleges and the petitioner proves that:

> (i) the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;
> (ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or
> (iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.

(2) Any petition invoking an exception provided in paragraph (1) shall be filed within 60 days of the date the claim could have been presented.
(3) For purposes of this subchapter, a judgment becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review.

(4) For purposes of this subchapter, "government officials" shall not include defense counsel, whether appointed or retained.

42 PA. CONS. STAT. § 9545(b).  As the statutory language makes clear, the PCRA's one-year statute of limitations would apply to a "second or successive" petition filed by Hodge.  His initial petition for allowance of appeal was denied by the Pennsylvania Supreme Court on September 9, 2004.  Doc. No. 13-2, p. 8.  Hence, his convictions became final on December 9, 2004, when discretionary review by the United States Supreme Court was no longer possible.  *Bowles v. Russell*, 551 U.S. 205, 212 (2007)(recognizing that a petition for a writ of certiorari must be filed within ninety days of the decision that the petitioner seeks to have reviewed).  The PCRA's one-year statute of limitations expired on December 9, 2005.  The Pennsylvania courts lack jurisdiction to entertain untimely PCRA petitions.  *Commonwealth v. Hall*, 771 A.2d 1232, 1234 (Pa. 2001).  Moreover, the PCRA is the *sole* basis provided under Pennsylvania law for an incarcerated individual to collaterally attack his or her conviction and sentence.  *Commonwealth v. Ahlborn*, 699 A.2d 718, 721 (Pa. 1997).  For these reasons, any attempt by Hodge to present his unexhausted claims to the Pennsylvania courts would be futile.

Since Hodge has established that "there is an absence of available State corrective process" for him to pursue, he has satisfied the statutory exhaustion requirement.  28 U.S.C. § 2254(b)(1)(B)(i).  This determination, however, does not end the inquiry.  "A finding of futility merely eliminates the procedural pretense of requiring a federal habeas petitioner to return to an unavailable state forum for nonexistent relief."  *Lines*, 208 F.3d at 166.  "Out of respect for finality, comity, and the orderly administration of justice," a federal court ordinarily will not entertain the merits of a claim that has been procedurally defaulted under state law.  *Dretke v.*

29

*Haley*, 541 U.S. 386, 388 (2004).  The Supreme Court has observed that, in this circumstance, "considerations of comity and concerns for the orderly administration of criminal justice require a federal court to forgo the exercise of its habeas corpus power."  *Francis v. Henderson*, 425 U.S. 536, 539 (1976).  Nonetheless, this general principle is a qualified one.  "[W]hile an adequate and independent state procedural disposition strips [the Supreme Court] of certiorari jurisdiction to review a state court's judgment, it provides only a strong prudential reason, grounded in 'considerations of comity and concerns for the orderly administration of justice,' not to pass upon a defaulted constitutional claim presented for federal habeas review."  *Dretke*, 541 U.S. at 392-393, quoting *Francis*, 425 U.S. at 539.  Accordingly, the Court can entertain Hodge's defaulted claims if he can establish "cause" for defaulting them and resulting "prejudice" to him, or if he can establish that this Court's failure to consider the claims would result in a fundamental miscarriage of justice.  *Hubbard*, 378 F.3d at 338.

Since Hodge presents no new evidence of his innocence, he clearly cannot show that a miscarriage of justice would result from this Court's failure to consider the merits of his defaulted claims.  *Goldblum*, 510 F.3d at 225.  With respect to the "cause" and "prejudice" inquiry, an attorney's deficient performance can be properly characterized as the "cause" of a procedural default only where it is sufficiently egregious to constitute a violation of the United States Constitution.  *Cristin v. Brennan*, 218 F.3d 404, 420 (3d Cir. 2002).  The Supreme Court recently held that the Constitution does not require a criminal defense attorney to advance every conceivable nonfrivolous argument.  *Knowles v. Mirzayance*, 129 S.Ct. 1411, 1422 (2009).  Hodge fails to explain why his defaulted claims were of such particular strength that no reasonably competent attorney would have abandoned them.  Consequently, he cannot show that

attorney ineffectiveness "caused" him to default these claims on direct review.  *Cristin*, 218 F.3d at 420.

Under Pennsylvania law, Hodge's ineffectiveness claims were not subject to waiver until the collateral-review stage.  *Commonwealth v. Grant*, 813 A.2d 726, 738-739 (Pa. 2002).  The constitutional right to the *effective* assistance of counsel is dependent upon the constitutional right to counsel itself.  *Evitts*, 469 U.S. at 396, n. 7.  Hodge had no *constitutional* right to counsel when pursuing collateral relief.  *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987).  The only ineffectiveness claim presented to the Superior Court during the PCRA proceedings concerned Hodge's trial counsel's failure to object to allegedly inflammatory statements made by the prosecutor during her closing argument to the jury.  Doc. No. 13-6, pp. 6, 15-21.  This claim, which was rejected by the Superior Court, is not asserted by Hodge in the instant habeas corpus proceeding.  Doc. No. 3, pp. 11, 13; Doc. No. 6, p. 1; Doc. No. 13-6, pp. 24-31.  The ineffectiveness claims concerning the alleged failure of Hodge's trial and appellate attorneys to investigate Semenko's identification of Price as his assailant were never presented to the Superior Court.  When Hodge's PCRA counsel opted to abandon these claims, he was acting as Hodge's agent.  Consequently, the decision to abandon those claims was directly attributable to Hodge.[12]  *Coleman v. Thompson*, 501 U.S. 722, 752-754 (1991).  Even if Hodge's trial and appellate attorneys *were* ineffective (thereby establishing "cause" for the procedural default of the underlying substantive issues at trial or on direct appeal), his ineffectiveness claims were

---

[12]The record indicates that Hodge disagreed with his PCRA counsel's decision not to pursue these ineffectiveness claims.  Doc. No. 13-6, p. 21.  The claims were evidently abandoned because they had no merit.  Doc. No. 13-5, p. 17.  Hodge's trial counsel presented Riazzi's testimony that Semenko had pointed to a photograph of Price when asked whether a photographed individual looked like his attacker.  TT at 715-717.  It is not clear why Hodge appears to castigate his trial counsel for *failing* to present evidence that actually *was* presented.

*themselves* subject to procedural default on collateral review.  *Edwards v. Carpenter*, 529 U.S.

446, 451-453 (2000).  Since these claims were procedurally defaulted during the PCRA

proceedings, they will not be considered at this stage.

      **C.**      **The Procedural Default of the Claims Previously Presented as State Claims**

      Hodge can pursue habeas corpus relief "only on the ground that he is in custody in

violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  It is

axiomatic that habeas corpus relief cannot be based on an error of state law.  *Gilmore v. Taylor*,

508 U.S. 333, 342 (1993); *Richmond v. Lewis*, 506 U.S. 40, 51 (1992); *Estelle v. McGuire*, 502

U.S. 62, 67-68 (1991); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).  Hodge argues that his rights

under the Due Process Clause of the Fourteenth Amendment were violated by the trial court's

denial of defense counsel's motion to sever the different criminal charges for trial, by the

admission of photographs depicting Hajduk's body after the murder, by the admission of

Hawkins' tape-recorded interview, and by the trial court's denial of defense counsel's motion for

a mistrial based on comments made by the prosecutor during her closing argument.  Doc. No. 3,

pp. 11, 13.  As an initial matter, the Court notes that mere errors of state law do not necessarily

constitute violations of the Due Process Clause.  *United States v. Torres*, 383 F.3d 92, 104 (3d

Cir. 2004).  Under the present circumstances, however, the Court need not decide whether any of

the errors alleged by Hodge constituted federal constitutional violations, since the record clearly

indicates that the underlying issues were litigated and adjudicated solely on the basis of

Pennsylvania law.

      In order to properly exhaust a federal claim before a state court, a petitioner must make it

clear to that court that his or her claim is based, at least in part, on the alleged violation of a

federal right. *Dye v. Hofbauer*, 546 U.S. 1, 4 (2005). It is not sufficient for a petitioner to *generally* rely on federal law. For instance, vague references to broad constitutional principles such as "due process of law" do not "fairly present" federal claims to state courts. *Gray v. Netherland*, 518 U.S. 152, 162-163 (1996). A petitioner must specify the precise nature of his or her federal claims to the state courts in order to have them considered in a subsequent habeas corpus proceeding. *Duncan v. Henry*, 513 U.S. 364, 365-366 (1995). A federal claim is not "fairly presented" to a state court if that court must look beyond "a petition or brief" in order to discover or understand the basis for the claim. *Baldwin v. Reese*, 541 U.S. 27, 30-33 (2004).

The four claims at issue were both *presented* and *adjudicated* as state-law claims rather than as federal constitutional claims. On direct review before the Superior Court, Hodge did not base his arguments on the Due Process Clause. Instead, he specifically relied on principles of Pennsylvania law. He argued that the criminal charges against him should have been severed for trial pursuant to Pennsylvania Rule of Criminal Procedure 583. Doc. No. 13-3, pp. 43-44. He contended that the admission of photographs depicting Hajduk's body had been contrary to Pennsylvania Rules of Evidence 401 and 403. Doc. No. 13-3, p. 50. He asserted that the admission of Hawkins' tape-recorded interview had not been consistent with Pennsylvania Rule of Evidence 613(c). Doc. No. 13-4, p. 4. Although Hodge did not cite a specific provision of Pennsylvania law in support of his argument that a mistrial should have been granted because of the allegedly inflammatory statements made by the prosecutor during her closing argument, he relied solely on decisions issued by Pennsylvania courts and failed to include a reference to federal law. Doc. No. 13-4, pp. 6-13. In its opinion affirming Hodge's convictions, the Superior Court considered these issues solely in accordance with Pennsylvania law. Doc. No. 13-4, pp.

25-34.  There is no indication from either Hodge's brief or the Superior Court's opinion that these claims were presented or adjudicated as federal constitutional claims.

If a habeas corpus petitioner wishes to argue that a trial court's evidentiary ruling has violated his or her rights under the Due Process Clause, he or she must make it clear to the state courts that his or her argument is based on the Due Process Clause rather than on some independent legal principle.  *Duncan*, 513 U.S. at 365-366.  Hodge obviously did not satisfy this requirement.  Hence, his evidence-based "due process" claims are subject to procedural default.  These claims can be considered only upon a showing of "cause" and "prejudice," or upon a showing that this Court's failure to adjudicate them would constitute a fundamental miscarriage of justice.  *Hubbard*, 378 F.3d at 338.

As noted earlier, Hodge presents no new evidence of his innocence.  Therefore, he cannot show that a miscarriage of justice would result from this Court's failure to consider the merits of his defaulted claims.  *Goldblum*, 510 F.3d at 225.  Although attorney ineffectiveness can constitute "cause" for a procedural default, Hodge must demonstrate that his arguments have substantive merit in order to establish that his counsel's failure to advance them on direct review was professionally unreasonable.  *Horton v. Ercole*, 557 F.Supp.2d 308, 327 (N.D.N.Y. 2007). He cannot show that his arguments are meritorious.  While the Due Process Clause constitutionalizes "minimum standards" to ensure fundamental fairness in the criminal justice system, it does not mandate adherence to "heightened procedural rules" such as the Pennsylvania Rules of Evidence.  *United States v. Taylor*, 302 F.Supp.2d 901, 905 (N.D. Ind. 2003)(observing that the Federal Rules of Evidence provide broader protections than those mandated by the Due Process Clause of the Fifth Amendment).  The Superior Court concluded, as a matter of

Pennsylvania law, that Hodge's evidentiary arguments were lacking in merit.  Doc. No. 13-4, pp.

25-34.  That determination is conclusive in this habeas corpus proceeding.  *Priester v. Vaughn*,

382 F.3d 394, 402 (3d Cir. 2004).  Hodge makes no attempt to explain why he believes that the

Due Process Clause affords him broader protection than that provided under Pennsylvania law,

or why he believes that his counsel acted unreasonably in advancing specific state-law

evidentiary arguments rather than amorphous arguments under the Due Process Clause.

Accordingly, he cannot establish "cause" for defaulting his "due process" claims.  The Court

need not address them further.

### D.      The Sufficiency Claim Concerning the First-Degree Murder Conviction

A criminal conviction is not secured in conformity with the Due Process Clause unless

the State has proven each element of the charged offense "beyond a reasonable doubt."  *In re

Winship*, 397 U.S. 358, 361-368 (1970).  In *Jackson v. Virginia*, 443 U.S. 307, 321 (1979), the

Supreme Court made it clear that a state prisoner who alleges that the evidence in support of his

or her conviction "cannot be fairly characterized as sufficient to have led a rational trier of fact to

find guilt beyond a reasonable doubt" states a federal constitutional claim.  "[S]uch a claim is

cognizable in a federal habeas corpus proceeding."  *Jackson*, 443 U.S. at 321.  The standard for

determining whether a particular conviction constitutes a violation of the Due Process Clause

"must be applied with explicit reference to the substantive elements of the [relevant] criminal

offense as defined by state law."  *Id.* at 324, n. 16.  In evaluating a claim under *Jackson*, a federal

habeas corpus court faced with a factual record supporting conflicting inferences must presume

that the trier of fact has resolved all dispositive conflicts in favor of the prosecution, and must

defer to such resolution.  *Id.* at 326.

Hodge contends that the evidence presented at trial was insufficient to warrant a conviction for the crime of first-degree murder.  Doc. No. 3, p. 11.  The Commonwealth argues that this claim has been procedurally defaulted because of Hodge's failure to raise it as a federal claim.  Doc. No. 12, pp. 14-17.  Admittedly, Hodge did not specifically reference the Due Process Clause in his brief to the Superior Court, nor did he expressly rely on federal law in support of his challenge to the sufficiency of the evidence.  Doc. No. 13-3, pp. 36-40.  The Superior Court did not specifically refer to federal law in its opinion affirming Hodge's conviction.  Doc. No. 13-4, pp. 24-25.  Nevertheless, some federal courts, including the United States Court of Appeals for the Third Circuit, have acknowledged that sufficiency claims are so commonly recognized as federal constitutional claims that the federal nature of such claims can be presumed.  *Evans v. Court of Common Pleas*, 959 F.2d 1227, 1231 (3d Cir. 1992); *Brinson v. Walker*, 407 F.Supp.2d 456, 463-464 (W.D.N.Y. 2006).  The Pennsylvania courts recognize that a challenge to the sufficiency of the evidence to sustain a criminal conviction has federal constitutional implications.  *Commonwealth v. Hall*, 830 A.2d 537, 541 (Pa. 2003); *Commonwealth v. Moss*, 852 A.2d 374, 381-382 (Pa.Super.Ct. 2004).  In a criminal case, the Due Process Clause requires the State to prove *each element* of the charged crime beyond a reasonable doubt.  *Fiore v. White*, 531 U.S. 225, 228-229 (2001).  Since this standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law," it should come as no surprise that prisoners raising sufficiency claims often rely on state-court decisions construing the particular state statutes at issue.  *Jackson*, 443 U.S. at 324, n. 16.  This focus on the intricacies of state law does not convert a concededly federal claim into a state claim merely because a prisoner has failed to expressly reference the Due Process Clause.

*Evans*, 959 F.2d at 1231-1233; *Brinson*, 407 F.Supp.2d at 463-464.  While it would certainly behoove prisoners to make their reliance on federal law clear in situations such as this, the Court is convinced that Hodge's sufficiency claim on direct appeal was considered and adjudicated as a federal constitutional claim, and that further consideration of that claim is warranted in the instant habeas corpus proceeding.

Under Pennsylvania law, "[a] criminal homicide constitutes murder of the first degree when it is committed by an intentional killing."  18 PA. CONS. STAT. § 2502(a).  The term "[i]ntentional killing" is defined as "[k]illing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing."  18 PA. CONS. STAT. § 2502(d).  The requisite intent to take the life of another person can be fully formed within a very short period of time.  *Commonwealth v. Cannady*, 590 A.2d 356, 358 (Pa.Super.Ct. 1991).  "An intent to kill can be formed in a fraction of a second."  *Commonwealth v. Davis*, 479 A.2d 1077, 1080 (Pa.Super.Ct. 1984).  "All that is required is a conscious, fully informed intent to bring about the death of another."  *Id.*

In disposing of Hodge's argument, the Superior Court explained:

> In the present case, the Commonwealth's evidence established that Appellant was in possession of the decedent's car immediately following the murder, and that he thereafter used the decedent's credit cards.  Appellant was arrested in possession of Mr. Hajduk's car and credit card and had stored other papers belonging to Mr. Hajduk in his girlfriend's car.  Further, Appellant confessed to Ms. Hawkins that he had killed the man who owned the Ford Explorer, which was Mr. Hajduk.  Finally, it was established that Mr. Hajduk was stabbed to death with a knife, including a knife wound to the chest, thus establishing the specific intent to kill.
> Appellant suggests that since Ms. Hawkins subsequently recanted her position that he had confessed to the murder, his conviction should not be based upon that confession.  However, the jury assessed Ms. Hawkins' statement that she felt pressured by police to say that Appellant confessed, and the jury also heard the tape recording given to police.  It was within the jury's province to

judge her credibility.  ***Commonwealth v. Hanible***, ___Pa.___, 836 A.2d 36 (2003)
(fact that on stand, witness recanted statement previously given to police, did not
render evidence insufficient to support conviction; jury was free to evaluate
witness's statement to police and testimony at trial recanting that statement and
could believe all, part, or none of the evidence).  Under the circumstances, the
Commonwealth's evidence was sufficient to establish beyond a reasonable doubt
that Appellant was the perpetrator of Mr. Hajduk's murder and that Appellant
possessed the specific intent to kill.

Doc. No. 13-4, pp. 24-25 (italics and boldface type in original).  In order to obtain habeas corpus

relief, Hodge must show not merely that the Superior Court's decision was "incorrect or

erroneous," but that it was "objectively unreasonable."  *Wiggins v. Smith*, 539 U.S. 510, 520-521

(2003).

Hodge argues that the evidence presented at trial did not establish that he had murdered

Hajduk.  Doc. No. 3, p. 11.  In the alternative, he argues that the evidence presented at trial did

not show that he had formed the intent to kill Hajduk prior to attacking him.  *Id.*  These

arguments are unpersuasive.  A murder conviction, just like any other conviction, can be based

on circumstantial evidence and the reasonable inferences drawn therefrom.  *Bossett v. Walker*, 41

F.3d 825, 830 (2d Cir. 1994).  "So long as the totality of the circumstantial evidence relating to

intent would enable a reasonable factfinder to infer such intent beyond a reasonable doubt, the

due process requirement for sufficiency of the evidence on that element of the offense is

satisfied."  *Government of the Virgin Islands v. Greene*, 708 F.2d 113, 115-116 (3d Cir. 1983).

The Superior Court concluded that Hawkins' tape-recorded statement concerning Hodge's

confession, when coupled with Hodge's possession of Hajduk's property in the immediate

aftermath of the murder, had provided a sufficient evidentiary basis to sustain the jury's finding

that Hodge had been the perpetrator of the crime.  Doc. No. 13-4, pp. 24-25.  The Superior Court

also held that Hodge's specific intent to kill Hajduk could be inferred from the knife wound to

Hajduk's chest.  *Id.*  This disposition of Hodge's appeal was eminently reasonable.

At trial, Manches identified Hodge as the individual whom she had seen driving Hajduk's

Explorer within hours of the murder.  TT at 431.  James, a Secret Service agent, showed the jury

the jacket that had been seized from Hodge at the time of his arrest.  TT at 481.  The jacket was

apparently the same one which had been worn by the black male depicted on a videotape at the

time that Hajduk's credit card was being used to facilitate a transaction at Kaufmann's.  TT at

479-481.  A warranty book bearing Hajduk's name was found in Hawkins' Mazda.  TT at 619-

620.  Hawkins acknowledged that Hodge had used Hajduk's credit card.  TT at 596-598.  Basille

identified Hodge as the individual responsible for crashing Hajduk's Explorer into a building.

TT at 454.  The jury also heard Hawkins' tape-recorded statement claiming that Hodge had

confessed to the murder.  TT at 617.  Prior to his apprehension, Hodge attempted to flee from the

arresting police officers.  TT at 452-457.  His attempt to evade capture constituted evidence that

he was conscious of his guilt.  *Commonwealth v. Hudson*, 955 A.2d 1031, 1036 (Pa.Super.Ct.

2008).  Furthermore, the jury heard evidence that Hajduk's Explorer had been stolen just two

days after Hodge had abandoned Constance's Mercedes, which had also been stolen.  TT at 126,

140, 427.  The Commonwealth presented overwhelming evidence of Hodge's guilt to the theft of

the Mercedes.  Because the theft of the Mercedes had been effectuated in a manner similar to the

theft of the Explorer, it was reasonable for the jury to infer that the same individual had been

responsible for both thefts.  *Commonwealth v. Weakley*, 972 A.2d 1182, 1189-1191

(Pa.Super.Ct. 2009).

As the forgoing analysis illustrates, the Commonwealth presented an overwhelming

amount of circumstantial evidence that Hodge had murdered Hajduk.  Hodge's belief that direct

physical or testimonial evidence of his guilt was necessary to warrant a first-degree murder

conviction is in error.  In *Holland v. United States*, 348 U.S. 121 (1954), the Supreme Court

declared:

> Circumstantial evidence in this respect is intrinsically no different from
> testimonial evidence.  Admittedly, circumstantial evidence may in some cases
> point to a wholly incorrect result.  Yet this is equally true of testimonial evidence.
> In both instances, a jury is asked to weigh the chances that the evidence correctly
> points to guilt against the possibility of inaccuracy or ambiguous inference.  In
> both, the jury must use its experience with people and events in weighing the
> probabilities.  If the jury is convinced beyond a reasonable doubt, we can require
> no more.

*Holland*, 348 U.S. at 140.  These legal principles compel the conclusion that the Superior

Court's decision affirming Hodge's conviction for the crime of first-degree murder was not an

objectively unreasonable application of *Jackson*.[13]  Since the AEDPA clearly forecloses the

habeas corpus relief sought by Hodge in this case, the Court need not make an independent

determination as to whether the evidence presented at trial was sufficiently probative of Hodge's

guilt to satisfy the Due Process Clause.  *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).  It suffices

to say that habeas corpus relief is not warranted.

### E.        Certificate of Appealability

In the absence of a COA, Hodge may not appeal this Court's decision denying his

petition for a writ of habeas corpus.  28 U.S.C. § 2253(c)(1)(A).  A COA may be issued only if

Hodge "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. §

---

[13]The Court's inquiry is limited to the first-degree murder conviction.  No opinion is expressed concerning whether the Commonwealth presented sufficient evidence to prove beyond a reasonable doubt that Hodge had been Semenko's assailant.

2253(c)(2).  With respect to this Court's merits-based determination, Hodge can obtain a COA only by demonstrating that reasonable jurists would find this Court's assessment and disposition of his claim to be "debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  With respect to the claims which have been rejected on procedural grounds, Hodge must show *both* "that jurists of reason would find it debatable whether [his] petition states a valid claim of the denial of a constitutional right" *and* "that jurists of reason would find it debatable whether [this Court is] correct in its procedural ruling[s]."  *Id.*  Since reasonable jurists would not quarrel with this Court's assessment and disposition of the substantive and procedural issues in this case, Hodge is not entitled to a COA with respect to any of the issues raised in his petition or discussed in this opinion.

## V.    Conclusion

Ten of Hodge's eleven claims were procedurally defaulted during the pendency of the proceedings in the Pennsylvania courts, and the AEDPA forecloses habeas corpus relief based on the remaining claim.  The petition for a writ of habeas corpus will be denied, and no COA will be issued.  An appropriate Order will follow.


Dated: October 26, 2009                                        By the Court:

                                                               Lisa Pupo Lenihan
                                                               United States Magistrate Judge


cc:    All Counsel of Record

       Kristian L. Hodge
       EJ-4409
       S.C.I. at Dallas

41

1000 Follies Road
Dallas, PA 18612